STATE OF MAINE                                SUPERIOR COURT
CUMBERLAND ss.                            CRIMINAL ACTION
                                            DOCKET NO. CR-19-185

STATE OF MAINE,                     )
                                   )
v.                                         )        ORDER ON MOTION
                                   )        TO SUPPRESS
MANFORD RIDEOUT,                )
                                   )
               Defendant        )

This matter is before the court on Defendant Manford Rideout's Motion to Suppress statements made to law enforcement on November 13 and 14, 2018.[1] Mr. Rideout was the driver of a flatbed tow truck involved in a fatal motor vehicle crash that occurred just after 6:30 a.m. on November 13, 2018 in Windham. A testimonial hearing was held on March 11, 2000. The court heard from Patrol Officer Joshua Katuzny and Detective Paul Cox.[2] State's Exhibits 1-4 were admitted into evidence without objection.

The court acknowledges that a significant period of time elapsed between the Motion hearing and the court's Order. As the result, the court spent a great deal of time viewing and listening to State's Exhibit 2, Officer Katuzny's Dash Cam video that includes three separate interactions with Mr. Rideout. The first interaction, which lasted a minute or less, was while Mr. Rideout was standing near the crash scene. The subsequent interactions, also of brief duration, occurred while Mr. Rideout was receiving medical attention in the back of an ambulance at the scene. The court also reviewed the hearing transcript and State's Exhibit 4, Mr. Rideout's medical records.

At the conclusion of the motion hearing, the court orally denied Defendant's Motion to Suppress the first of the three interactions between Officer

---

[1] The parties agree that statements made by Defendant at the hospital on November 13, 2018 are not being offered into evidence.

[2] Detective Cox the lead investigator. At the motion hearing, he was close to retirement and back working patrol. For clarity purposes, the court will refer to him as Detective Cox.

1                      Entered on the Docket: 7-30-2021

Katuzny and Mr. Rideout on November 13, 2018; and, the court orally denied Defendant's Motion to Suppress Detective Cox' interview of Mr. Rideout on November 14, 2018.

With regard to statements made to Officer Katuzny while Defendant was being treated in the ambulance on November 13, 2018, Defendant asserts that he was not physically and mentally able to provide a voluntary statement to the officer due to his physical and mental condition. While there is disagreement as to the cause, the parties do not disagree that Mr. Rideout's physical condition began to deteriorate while he was in the ambulance. Indeed, on the way to the hospital he received two doses of Narcan. Based on the evidence presented, the court requested counsel to provide citations and holdings of cases dealing with the impact of intoxication on voluntariness. The court has reviewed the cases and holdings provided by Defense counsel.[3]

---

[3] *Palmer v. State*, 401 So.2d 266, 268 (Ala. Cr. App.), writ denied, 401 So.2d. 270 (Ala. 1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed. 2d 463 (1982):
"In order for intoxication to render a confession inadmissible, it must be shown that the mind would have been impaired substantially." The decree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed by the trial court and depending upon its ruling, then to the jury for its consideration." (Internal citations omitted.)
*State v. Stevenson*,(La. App. 5 Cir 06/28/05), 908 So. 2d 48, 54:
"Intoxication renders a confession involuntary when the intoxication is of such a degree as to negate the defendant's comprehension and to make him unconscious of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact and a trial judge's conclusions on this issue will not be disturbed unless unsupported by the evidence. In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion to suppress but may also consider pertinent evidence given at trial." "Intoxication, while relevant, is not per se determinative of the voluntariness of a confession. The focal issue is to what extent did the intoxication deprive appellant of his mental faculties." *Id.*
*Siler v. State*, 2005 WY 73m 115 P.3d 14,26:
"For intoxication to render a confession involuntary, the impairment must be so great as to deprive an individual of a capacity to understand the meaning of his statements. (Internal citations omitted). Even though a defendant appears intoxicated, that fact that he understood that he was doing, carried on a conversation and responded to questions will render the statements admissible. (Internal citations omitted). The proper inquiry regarding intoxication is whether a confession cannot be said to be the product of rational intellect and free will because of extreme intoxication. (Internal citations omitted.

2

## FINDINGS OF FACT

On the morning of November 13, 2018, just after 6:30 a.m., Officer Joshua Katuzny of the Windham Police was on duty. He was dispatched to a motor vehicle crash on Route 115. Upon arrival, Officer Katuzny parked his marked cruiser in front of the driveway at 149 Tandburg Trail. He was able to observe that a tractor trailer, a flatbed tow truck, a Toyota Prius and another vehicle had been involved in a serious crash. Rescue and Fire personnel were already at the scene and there was fire apparatus in the road. Officer Katuzny learned that the driver of the tractor trailer was David LaPlante and the driver of the flatbed tow truck was Manford Rideout. The driver of the Prius, who succumbed to his injuries shortly after the accident, was being tended to by Rescue personnel.

Officer Katuzny, who was in uniform, spoke briefly with Mr. LaPlante, who was standing near the tractor trailer. He described Mr. LaPlante as "shaken" but able to assist him in gathering information necessary for the crash investigation.

Officer Katuzny, who was familiar with Mr. Rideout, saw him standing nearby in a driveway. Calling him "Manny," Officer Katuzny greeted him cordially. He described Mr. Rideout as "upright and ambulatory." He noted a level of "what he believed to be impairment" in Mr. Rideout's speech, which he later described in his report as "labored and deliberate" ... "thought being put into what was being said." He also noted that Mr. Rideout's pupils were "pinpointed" and that he had a small laceration on his head. Officer Katuzny testified Mr. Rideout's speech was different from other times he had spoken with him. He also testified that despite these observations, Mr. Rideout appeared to understand what was going on and was able to answer questions necessary for the crash investigation.

These initial interactions with Mr. LaPlante and Mr. Rideout, combined, lasted only a minute or two. Officer Katuzny described them as conversational in tone.[4] Officer Katuzny, was the only officer at the scene. He did not tell Mr. LaPlante that he could not leave but said it was assumed. He told Mr. Rideout to

---

[4] There is video but no audio of Officer Katunzy's first interactions with Mr. LaPlante and Mr. Rideout. His dash cam was operational but his mic pack was not on. He surmised that because it was the beginning of his shift, he had not yet turned on the mic pack to pick up audio.

3

"hang tight" while he checked on the injured driver, and left him standing by a driveway. Mr. Rideout was free to walk about the accident scene; he was not placed under arrest; he did not ask if he was under arrest; and, he did not ask if he could leave. Mr. Rideout was encouraged to get medical attention and two EMTs were able to bring him to an ambulance for that purpose.

Prior to the second interaction, Officer Katuzny learned that Mr. Rideout was on bail conditions that included no use or possession of alcohol, random search, and house arrest except for medical and legal appointments. Officer Katuzny contacted a Drug Recognition Expert (DRE).

After about 12 or 13 minutes, and while Mr. Rideout was in the ambulance with the EMTs, Officer Katuzny initiated his second interaction with Mr. Rideout.[5] Officer Katuzny testified that Mr. Rideout's speech was "deteriorating;" that it was "getting significantly worse;" and, "he was becoming more difficult to understand." He was also advised by the EMTs that Mr. Rideout's physical condition was deteriorating and that they were going to take him to Maine Medical.[6] Officer Katuzny's third interaction with Mr. Rideout occurred about 9 minutes after the second and also took place in the ambulance.

During the second and third interactions with Mr. Rideout, Officer Katuzny asked questions that were in keeping with those asked at the scene of a motor vehicle crash and/or during an OUI stop, i.e. "Where were you coming from?" "Are you licensed for the tow truck?" "Is there insurance on the vehicle?" "Did you take anything this morning?" Officer Katuzny also asked him, "Do you know Officer Jim Cook?" and then explained that Officer Cook was going to do a blood draw.

Mr. Rideout answered Officer Katuzny's questions, saying he was going to get diesel fuel; the truck has a dealer plate; he just woke up; and, he was going to his doctor's office because of an issue with his feeding tube. Officer Katuzny testified that Mr. Rideout responded "fine" but was more difficult to understand with each successive interaction; and, by the third interaction, medical personnel

---

[5] Officer Katuzny had activated his mic pack by this time so there is an audio recording of the second and third interactions with Mr. Rideout.

[6] Mr. Rideout was given the choice of Maine Medical or Mercy and he chose Maine Medical.

4

could not understand what he was attempting to say. Officer Katuzny did not perform any standard field sobriety tests due to the nature of the crash and because Mr. Rideout was receiving medical attention.

Officer Katuzny was the only member of law enforcement on the scene to speak with Mr. Rideout until Officer Cook arrived to attempt a blood draw. Detective Cox, the lead investigator, arrived at the scene just after his shift started at 7:00 a.m. He testified that he never saw or spoke to Mr. Rideout at the crash scene. He was made aware that the attempt to draw blood from Mr. Rideout was unsuccessful. He also learned that just prior to leaving for Maine Medical and then while being transported, Mr. Rideout was administered two doses of Narcan, which he responded to successfully.

## CONCLUSIONS OF LAW

The first issue for the court's consideration is whether the statements Defendant made were obtained in violation of federal and state law and must be suppressed. Defendant argues that it was a "custodial interrogation" and, therefore required that *Miranda* warnings had to be given. The State argues that the Defendant was not in custody so there was no violation of his Fifth Amendment rights as articulated in *Miranda v. Arizona*, 384 U.S. 346, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The law is clear that a *Miranda* warning is necessary if a defendant is: (1) in custody; and (2) subject to interrogation. Statements made by a person subjected to custodial interrogation who is not first given *Miranda* warnings are inadmissible against that person at trial. State v. Nadeau, 2010 ME 71 ¶53, 1 A.3d 445, 464 (internal citations and punctuation omitted.) A person, who is not subject to formal arrest, may be in custody if a reasonable person standing in the shoes of the defendant would have felt that he was not at liberty to terminate the interrogation and leave or if there was a formal arrest or restraint on freedom of movement. Id. The State must prove that police conduct was constitutionally valid by a preponderance of the evidence. State v. Kittredge, 2014 ME 90 ¶17, 97 A.3d 106. Courts consider the totality of the circumstances, including the factors enumerated

5

below, when assessing whether a person is in custody. Those factors include but are not necessarily limited to the following:

(1)     the locale where the defendant made the statements;

(2)     the party who initiated contact;

(3)     the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4)     subjective views, beliefs, or intent that the police manifested to the defendant to the extent they would affect how reasonable person in the defendant's position would perceive his or her freedom to leave;

(5)     subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6)     the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7)     whether the suspect was questioned in familiar surroundings;

(8)     the number of law enforcement officers present;

(9)     the degree of physical restraint placed upon the suspect; and,

(10)    the duration and character of the interrogation.

In keeping with *Kittredge*, the court's analysis of the facts in this case is as follows:

Officer Katuzny was the first law enforcement officer to arrive at the fatal crash scene involving a tractor trailer, flatbed tow truck, Toyota Prius and another vehicle. He learned that the driver of the flatbed tow truck was Manford Rideout. Mr. Rideout was standing by a driveway near the crash scene. Officer Katuzny, who was in uniform, approached and spoke briefly with Mr. Rideout. This first interaction with Mr. Rideout lasted less than a minute. Officer Katuzny never told Mr. Rideout that he was under arrest; nor, did Mr. Rideout ask if he was under arrest. Officer Katuzny never told Mr. Rideout that he was not free to leave; nor, did Mr. Rideout ask if he was free to leave. Officer Katuzny did tell Mr. Rideout to "hang tight," while he checked on the status of the injured driver of the Prius.

6

Mr. Rideout was brought to the ambulance for evaluation by two EMTs. While he was in the ambulance receiving medical care, Officer Katuzny approached Mr. Rideout a second and third time. Both of these interactions lasted only a minute or two. Officer Katuzny asked Mr. Rideout a few more questions such as: "Where were you coming from?" "Are you licensed for the tow truck?" "Is there insurance on the vehicle?" "Did you take anything this morning?" Mr. Rideout answered Officer Katuzny's questions, saying he was going to get diesel fuel; the truck has a dealer plate; he just woke up; and, he was going to his doctor's office because of an issue with his feeding tube. Again, Officer Katuzny never told Mr. Rideout that he was under arrest; nor, did Mr. Rideout ask if he was under arrest. Officer Katuzny never told Mr. Rideout that he was not free to leave; nor, did Mr. Rideout ask if he was free to leave.

Officer Katuzny's interactions with Mr. Rideout were extremely brief. He was the only law enforcement officer present when he asked questions about the motor vehicle crash. The questions asked were in keeping with those routinely asked at the scene of a motor vehicle crash and/or during an OUI stop. The tone and character of the interactions were conversational and cordial.

Based on the foregoing, the court concludes that a reasonable person standing in the shoes of the defendant would not have felt he was not at liberty to terminate the interrogation and leave. Because Mr. Rideout was not in custody, there was no need to advise him of his *Miranda* rights.

Defendant next asserts that information gleaned from the second and third encounters with Mr. Rideout, while he was in the ambulance, were not given voluntarily. The State argues that Mr. Rideout understood the questions and provided voluntary responses in a non-custodial setting; therefore, the information obtained is admissible.

In order for a statement to be voluntary, the State must establish beyond a reasonable doubt that it is "the free choice of a rational mind, fundamentally fair, and not a product of coercive police conduct." *State v. Bryant*, 2014 ME 94 ¶¶15-16. In determining voluntariness, we consider the totality of the circumstances. *Id* ¶ 16. That a person is under the influence of drugs or in emotional distress does not, by itself, render a statement involuntary. See *State v. Lowe*, 2013 ME 92, ¶22. Rather,

7

the particular circumstances of each case must be evaluated to determine whether a defendant's drug-related or emotional condition made him incapable of acting voluntarily, knowingly, and intelligently. See *State v. Ashe*, 425 A.2d 191, 194 (Me. 1981); *State v. Coombs*, 1998 ME 1, ¶¶6, 12; *State v. Philbrick*, 481 A.2d 488, 494 (Me. 1984).

The Law Court has addressed the analysis to be used by a reviewing court in assessing a voluntariness claim:

> In applying the totality of the circumstances analysis to determine voluntariness, [the Law Court] ha[s] considered both external and internal factors, such as: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of Miranda warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct. *State v. Sawyer*, 2001 ME 88, ¶9, 772 A.2d 1173, 1176.

From the facts presented at the motion hearing and the courts analysis of whether Mr. Rideout was in custody for purposes of *Miranda*, the court concludes that even though Mr. Rideout's speech was "deteriorating" and "he was becoming more difficult to understand," Mr. Rideout was able to answer Officer Katuzny's questions. The questions, in keeping with those routinely asked at a motor vehicle crash and/or OUI, consisted of "Where were you coming from?" "Are you licensed for the tow truck?" "Is there insurance on the vehicle?" "Did you take anything this morning?" Mr. Rideout answered Officer Katuzny's questions, saying he was going to get diesel fuel; the truck has a dealer plate; he just woke up; and, he was going to his doctor's office because of an issue with his feeding tube. Officer Katuzny testified that Mr. Rideout responded "fine." Despite his observations and those of the EMT's regarding Mr. Rideout's physical condition, Mr. Rideout was able to answer questions appropriately and even expressed a preference for which hospital he would be taken to by the ambulance. *See Silver v. State*, 2005 WY 73, 115 P.3d 14, 26 (Even though a defendant appears intoxicated,

8

that fact that he understood that he was doing, carried on a conversation and responded to questions will render the statements admissible.)

Based on the totality of the circumstances, the court finds that the State has established by a preponderance of the evidence that the "interviews" were non-custodial. The court also finds that the State has proved beyond a reasonable doubt that Defendants statements were voluntary.

Accordingly, Defendant's Motion to Suppress is Denied.

July 30, 2021

MaryGay Kennedy
Justice, Maine Superior Court

9